ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16CR307 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge John R. Adams |
| ANTONIO NAVARRO-GAYTAN, | ) | |
| ALEJANDRO COTA-LUNA, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendants. | ) | |

**I. Introduction**

On May 18, 2017, the Court began sentencing hearings for Defendants Antonio Navarro-Gaytan and Alejandro Cota-Luna. During the hearing, the Court heard argument from the parties related to certain sentencing enhancements. This memorandum will serve to resolve the parties' arguments regarding those enhancements.

**II. Sentencing Process**

Criminal sentencing is often described as a three-step process. A district court must begin the process by calculating the advisory guideline range suggested by the United States Sentencing Commission. *Rita v. United States*, 551 U.S. 338, 351 (2007) ("The sentencing judge… will normally begin by considering the presentence report and its interpretation of the Guidelines.").

In so doing, the Court must determine the offense level for the crimes for which the defendant has been convicted and the defendant's criminal history. *See United States v. Boyd*, No. 3:07-CR-3, 2008 WL 4963198, at *14-16 (E.D.Tenn. Nov. 18, 2008).

Next, the Court must determine whether a variance or departure from the advisory guideline range would be appropriate. *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006).

> Finally, a sentencing court must independently evaluate each of the factors in 18 U.S.C. § 3553(a), which details the considerations that a district court must weigh before sentencing a criminal defendant. Although the Guidelines form a starting point in the district court's analysis under 18 U.S.C. § 3553(a), a district court may not presume that the sentence suggested by the Guidelines is appropriate for an individual criminal defendant. A district court may hear arguments by prosecution or defense that the Guidelines sentence should not apply. In this way, a sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. Ultimately, however, a court must exercise its independent judgment in sentencing a defendant.

*United States v. Stern*, 590 F.Supp.2d 945, 949 (N.D.Ohio 2008) (citations and quotations omitted).

As the court noted during the initial hearings, the Court will consider allocution and arguments of counsel related to the statutory factors when the sentencing hearings in this matter are re-commenced. This memorandum will only serve to provide the Court's initial advisory Guideline calculation.

**III. Analysis**

    A. Navarro-Gaytan

Several issues were presented and argued regarding Navarro-Gaytan's advisory Guideline range. The parties first asserted that Navarro-Gaytan was eligible for a reduction based upon

U.S.S.G. § 5C1.2, the safety valve provision of the Guidelines. § 5C1.2 provides as follows:

> (a) Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) set forth below:
>
> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of 4A1.3 (Departures Based on Inadequacy of Criminal History Category);
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

"When seeking a downward adjustment of a sentence otherwise required by the guidelines, a defendant has the burden of proving by a preponderance of the evidence his or her entitlement to a reduction." *United States v. Adu*, 82 F.3d 119, 123 (6th Cir. 1996). More specifically, "'[t]he defendant bears the burden of proving by a preponderance of [the] evidence his eligibility for the safety valve.' *United States v. Montes*, 381 F.3d 631, 634 (7th Cir. 2004). 'To carry his burden, the defendant must persuade the district court that he has made full, truthful disclosure of

information required by the safety valve.' *United States v. Aidoo*, 670 F.3d 600, 607 (4th Cir. 2012)." *United States v. Alvarez-Arellano*, No. 1:12-CR-1-TLS, 2014 WL 793354, at *5 (N.D. Ind. Feb. 27, 2014).

There is no dispute that Navarro-Gaytan satisfies the first four elements of the safety valve Guideline. The Court, however, cannot agree with the parties that Navarro-Gaytan has satisfied the fifth element detailed above.

The Court first acknowledges that were this simply a case in which Navarro-Gaytan spoke to the Government and provided no relevant information, he could still satisfy the fifth element. *See* U.S.S.G. § 5C1.2 (a)(5) (noting that the safety valve is intended to aid low level drug offenders, even if they have no "relevant or useful other information to provide" or "the Government is already aware of the information"). In the instant matter, however, Navarro-Gaytan did not provide *any* information to the Government. In fact, neither the investigating agent nor counsel for the Government ever spoke to Navarro-Gaytan. The parties seem to suggest that their agreement that Navarro-Gaytan satisfies the safety valve elements is sufficient. In that regard, the Sixth Circuit has noted:

> Under the safety valve provision, a defendant has the burden to prove that the criteria have been satisfied. The government has no obligation to solicit information that could help a defendant meet the requirements for the safety valve. Therefore, merely answering all questions posed by the government may not be sufficient to qualify for the fifth criterion of the safety valve. *See United States v. Adu*, 82 F.3d 119, 124 (6th Cir.1996) ( "These provisions clearly require an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses."); *United States v. Wrenn*, 66 F.3d 1, 3 (1st Cir.1995) (information obtained from recordings of defendant's conversations with an undercover agent not "provided" by defendant within the meaning of § 5C1.2(5)); *United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996) (defendants must act affirmatively "to ensure that the Government is truthfully provided with

4

all information and evidence the defendants have concerning the relevant crimes."). *United States v. O'Dell*, 247 F.3d 655, 675–76 (6th Cir. 2001). Accordingly, Navarro-Gaytan's counsel's argument that he was "never asked to meet with the Government" is misplaced. As noted in *O'Dell*, Navarro-Gaytan had an *affirmative* duty to provide information. He failed to do so. Accordingly, he cannot satisfy the safety valve elements.[1]

The parties also presented argument with respect to whether Navarro-Gaytan is entitled to a reduction as a minimal participant. To be entitled to receive a reduction under U.S.S.G. § 3B1.2, Navarro-Gaytan was required to "'prov[e] ... by a preponderance of the evidence ... that he played a relatively minor role in conduct for which he was held accountable." *United States v. Sheafe*, 69 Fed.Appx. 268, 270 (6th Cir. 2003). *See also United States v. Groenendal*, 557 F.3d 419, 427–28 (6th Cir. 2009). Navarro-Gaytan's argument with respect to this Guideline provision is similar to that raised and rejected in *Sheafe* and *United States v. Skinner*, 690 F.3d 772 (6th Cir. 2012). Herein, Navarro-Gaytan was apparently brought into to inspect the tractor trailer involved in this matter that transported the 92 kilograms of cocaine. In essence, Navarro-Gaytan's role was to ensure that no other participant in the transportation of the drugs had tampered with the drugs. As such, his role is remarkably similar to that of a drug courier or mule. In that respect, the Sixth Circuit has discussed the role of couriers as follows:

> As a courier, Skinner's role in the conspiracy was critical to its success. "[T]he critical question in whether to grant a 'mitigating role' reduction is what role the defendant played in relation to others involved in the criminal enterprise." *United States v. Henderson*, 307 Fed.Appx. 970, 983 (6th Cir. 2009) (citing *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir. 2002)). At sentencing, the district court

---

1 As Navarro-Gaytan cannot satisfy the safety valve elements, he is also ineligible for the additional 2-level reduction contained in U.S.S.G. § 2D1.1(b)(16).

determined that Skinner "facilitated the transportation of vast amounts of marijuana and money back and forth across the country," and "[t]he conspiracy would not have been successful without the participation of the drivers.... [T]his defendant facilitated and allowed this conspiracy to progress.... That is more than just a minor or minimum player." There is nothing in the record to suggest that these determinations were clearly erroneous, and they justify the district court's denial of the mitigating role adjustment. *See Campbell*, 279 F.3d at 396 (stating clearly erroneous standard for factual determinations).

Although Skinner argues that he should be granted the mitigating role reduction because he did not have a "high degree of culpability" in the conspiracy and because his role was largely limited to that of a courier or "mule," we affirmed the district court's denial of a mitigating role adjustment in a case factually similar to Skinner's. In *Sheafe*, the defendant was charged with several narcotics-related offenses due to his participation as the driver in three inter-state shipments of cocaine. 69 Fed.Appx. at 269. We rejected Sheafe's "protestations that he was a lowly courier" and determined it to be "immaterial that Sheafe was not the owner of the cocaine or the leader or organizer of the drug transaction. A defendant does not qualify for a mitigating role reduction merely because someone else planned the scheme and made all the arrangements." *Id*. at 270 (citation omitted). Rather, we determined that a "defendant who plays a lesser role in a criminal scheme may nonetheless fail to qualify as a minor participant if his role was indispensable or critical to the success of the scheme, or if his importance in the overall scheme was such as to justify his sentence." *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001) (citation omitted). As in Skinner's case, in Sheafe's case "the conspiracy could not have succeeded without someone to transport the [drugs]." *Sheafe*, 69 Fed.Appx. at 270.

*United States v. Skinner*, 690 F.3d 772, 783–84 (6th Cir. 2012).[2] The Seventh Circuit has also noted:

A drug courier should neither automatically receive nor automatically be precluded from receiving a role reduction. *See Hill*, 563 F.3d at 577. Instead, the controlling standard is whether the defendant is substantially less culpable than the average participant in the offense. *See* U.S.S.G. § 3B1.2. When assessing whether a defendant is substantially less culpable such that he should receive a role reduction, a defendant's "role should be compared to that of the average member of the

---

2 The Court would note that *Skinner* and *Sheafe* both involved more than one transaction. However, given the quantity and high level of purity of cocaine at issue in this matter, the Court finds the logic espoused in those cases to be equally applicable herein.

6

conspiracy, not with the leaders." *United States v. Gallardo*, 497 F.3d 727, 741 (7th Cir. 2007); *see also United States v. McGee*, 408 F.3d 966, 987 (7th Cir. 2005).

*United States v. Saenz*, 623 F.3d 461, 468 (7th Cir. 2010).

Herein Navarro-Gaytan's role was indispensable to the success of the transportation of the drugs. As noted during the hearing, 92 kilograms of cocaine has a street value in the millions of dollars. Moreover, the agent herein noted that the cocaine at issue tested at nearly 92% pure. In other words, the cocaine was pure enough that the amount, 92 kilograms, could nearly be doubled before it was sole on the street in a less pure form. Without Navarro-Gaytan's willingness to inspect the tractor-trailer to ensure that the drugs remained intact through transport, those higher up would have no assurance that their drugs would reach the streets. As such, without an actor like Navarro-Gaytan, such a large quantity of drugs could not be moved in one transport. Furthermore, the agent herein also noted that a vast majority of illegal drugs are transported across the border through the use of tractor trailers like the rig at issue here. Under the theory argued by Navarro-Gaytan, key cogs in this system would be repeatedly labeled minimal participants and escape appropriate sentences. In other words, the choice by cartel leaders to compartmentalize lower-level positions would be proven an effective strategy. This Court declines to allow such a result.

Moreover, the Court cannot say that Navarro-Gaytan was less culpable than the average member of the conspiracy. From the limited information presented to the Court, Navarro-Gaytan was one of numerous individuals that were assigned compartmentalized tasks with each having very limited information beyond his own task. While such a distribution a roles may limit the ability to gain information on higher ups in the organization, it also ensures that the "average"

participants in the scheme will all have similar levels of culpability. Based upon the information before this Court, Navarro-Gaytan has not proven by a preponderance of the evidence that he was less culpable than the average member. Rather, as noted above, his role of inspecting the tractor trailer played an important role in facilitating the transportation of the 92 kilograms of cocaine. As such, he is not entitled to a role reduction in this matter.

    B.  <u>Cota-Luna</u>

Cota-Luna raised issues during his hearing substantially similar to those raised by Navarro-Gaytan. For similar reasons, Cota-Luna's arguments are rejected.

With respect to safety-valve eligibility, Cota-Luna also failed to take any step to provide *any* information to the Government. During the hearing, Cota-Luna's counsel appeared to indicate that he himself provided information to the Government. As detailed above, however, the defendant has an affirmative duty to provide information. Without some form of personal communication by the defendant, this element cannot be satisfied.

Moreover, unlike Gaytan-Navarro, Cota-Luna has an additional obstacle that he cannot overcome to receive the benefit of the safety valve. In order to be eligible, Cota-Luna cannot be "an organizer, leader, manager, or supervisor of others in the offense." U.S.S.G. § 5C1.2(a)(4). In the instant matter, the record reflects that Cota-Luna both recruited and directed the activities of Gaytan-Navarro. The letter provided by Gaytan-Navarro in support of his sentencing serves to confirm this fact. Within that letter, Gaytan-Navarro notes: "In my profession as a truck driver you meet a lot of people good and bad like the one who offered me the job in Cleveland. I participated because I felt threatened and feared for the safety of my family. I knew Mr. Cota-Luna

was involved with dangerous people." Doc. 73-4 at 2. Similarly, Navarro-Gaytan's counsel was asked: "So Cota-Luna is who got your client involved in this?" and responded: "Yes, he did. He's the one who asked him to accompany him to the United States for this operation." Twice counsel later reiterates: "He was brought in by Mr. Cota-Luna." Cota-Luna does not deny (nor could he based on the record) that he brought Gaytan-Navarro into the criminal scheme. In response to this fact, Cota-Luna appears to argue that because both he and Gaytan-Navarro were so low in this criminal scheme, he should not be treated as an organizer, leader, manager, or supervisor. However, there is no legal authority for the position taken by Cota-Luna. Rather, the record reflects that Cota-Luna recruited Gaytan-Navarro because Cota-Luna did not have the skill set necessary to complete the task required by those higher up in the criminal scheme. As such, Cota-Luna's act of recruiting an additional member into the criminal scheme was done in order to ensure the success of the overall criminal scheme. Under these facts, Cota-Luna cannot satisfy the fourth element required to be eligible for the safety valve.[3]

Cota-Luna's argument for a reduction for his role in the offense is rejected for the same reason as the Court rejected Navarro-Gaytan's argument on this same issue. Cota-Luna's status as a courier in and of itself does not warrant the reduction. Moreover, with respect the specific quantity of drugs for which Cota-Luna is being held responsible, 92 kilograms, it cannot be said that he is less culpable than others in the criminal scheme. Cota-Luna not only helped ensure that the transportation of the drugs would be complete, but he recruited another party that could inspect

---

3 Similar to Navarro-Gaytan, because Cota-Luna is not eligible for the safety valve reduction, he also does not qualify for a reduction under U.S.S.G. § 2D1.1(b)(16).

the drug compartment and verify that there had been no tampering. As such, Cota-Luna did not meet his burden to show a reduction for his role in the offense was warranted.

C. Supplemental Sentencing Memorandum

The Government has attempted to remedy several of the shortcoming identified above through the filing of a supplemental sentencing memorandum on June 9, 2017. However, a "defendant must meet the safety valve's requirement of complete and truthful disclosure by the time of the *commencement* of the sentencing hearing." *United States v. Marin*, 144 F.3d 1085, 1091 (7th Cir. 1998) (emphasis added). While *Marin* dealt with a defendant that was initially untruthful and corrected his statements during his sentencing hearing, the logic espoused in *Marin* applies equally to defendants that have simply remained silent prior to their sentencing hearings. As *Marin* noted: "the government would not only be forced to wait until the sentencing hearing to receive the most accurate version of defendant's story but also would be compelled to conduct further investigation" to eventually examine the validity of that story. *Id*. at 1092.

"Congress enacted the safety valve statute to allow lenience toward low-level defendants 'who did their best to cooperate.'" *Id.* at 1095 (quoting *United States v. Montanez*, 82 F.3d 520, 522 (1st Cir. 1996).

> As a practical matter, a defendant who declines to offer himself for a debriefing takes a very dangerous course. It is up to the defendant to persuade the district court that he has "truthfully provided" the required information and evidence to the government. *United States v. Flanagan*, 80 F.3d 143, 145-47 (5th Cir.1996). And a defendant who contents himself with a letter runs an obvious and profound risk: The government is perfectly free to point out the suspicious omissions at sentencing, and the district court is entitled to make a common sense judgment, just as the district judge did in this case.

*United States v. Montanez*, 82 F.3d 520, 523 (1st Cir. 1996). Herein, both defendants clearly

chose an even more "dangerous course" than the one identified in *Montanez*. Both defendants made no effort to speak to the Government. Further, based upon the above, the Court finds that the Government's memorandum from June 9, 2017 does not satisfy the timing requirements of the safety valve because the information was not provided prior to the commencement of the sentencing hearings of the defendants. As the Government's own agent highlighted during the sentencing hearing, any information provided at such a late date would be of no value to the Government. As such, neither defendant can be said to have done his "best to cooperate."

Assuming *arguendo* that the Government's memorandum should be considered timely, the memorandum offers no aid to Cota-Luna. Regardless of any attempt to now provide information to the Government, the memorandum does not to alter the fact that Cota-Luna recruited and supervised Navarro-Gaytan during this criminal scheme. As such, Cota-Luna remains ineligible under the safety valve provisions.

The Court also finds substantial difficulty in concluding that Navarro-Gaytan has been entirely truthful in his disclosures. In his statement to the probation officer, Navarro-Gaytan stated: "I knew this was wrong but I was afraid to back out for fear that danger would come to me and my family." In his letter filed in support of his sentencing memorandum, Navarro-Gaytan stated: "I participated because I felt threatened and feared for the safety of my family. I knew Mr. Cota-Luna was involved with dangerous people. The cartel has no compassion." Doc. 73-4 at 2. At no point in time did Navarro-Gaytan or his counsel ever relay the extensive factual detail provide in the Government's supplemental memorandum. In that memorandum, Navarro-Gaytan effectively asserts that he was duped into participating in this conspiracy. According to Navarro-

11

Gaytan, Cota-Luna approached him to ask for help purchasing a crane in the U.S. and returning it to Mexico. Navarro-Gaytan claims that once they were in Cleveland. Cota-Luna told him that the crane deal had fallen through but that a truck might come through that Cota-Luna was interested in purchasing. Navarro-Gaytan in fact claims that it was not until *after* the defendants had inspected the trailer that Cota-Luna informed him that the two were there to pick up drugs and that both were under the threat of death.

Navarro-Gaytan's story strains credulity. To believe Navarro-Gaytan's narrative, this Court would have to believe all of the following. Navarro-Gaytan "knew that Cota-Luna was involved with dangerous people" and still agreed to come to the country with him. Having that knowledge, Navarro-Gaytan then accompanied Cota-Luna to a store to purchase tools. Navarro-Gaytan was willing to purchase these tools solely because Cota-Luna told him they could conceivably need them later in the trip. Navarro-Gaytan then watched Cota-Luna inspect the underside of the trailer utilizing gloves, paper towels, and degreaser. Throughout all of this, Navarro-Gaytan never had any inkling that drugs were involved. Upon learning that drugs were involved and that he was under the threat of death from a cartel, Navarro-Gaytan took no steps of any kind. He did not contact his loved ones in Mexico, and he did not attempt to return to Mexico

Navarro-Gaytan's story was not told until well after the commencement of the sentencing hearing in this matter. Moreover, it was not told until nearly 10 months after Navarro-Gaytan's arrest. As such, it not only offers no value to the Government, but it also deprives the Government any opportunity to verify the statements. The review by this Court, however, finds the story to lack credibility. It simply defies logic that Navarro-Gaytan was so eager to assist Cota-Luna that

12

he did not care that Cota-Luna's story changed so often. Moreover, it defies logic that Navarro-Gaytan learned of the involvement of a dangerous cartel and took no action of any kind. Rather, the evidence strongly suggests that Navarro-Gaytan knew precisely why he was being brought along this trip – to inspect a secret compartment utilized for transporting drugs. This conclusion is bolstered by the repeated statements of his counsel during the initial sentencing hearing. Counsel stated that his "role was to come to Cleveland to inspect the vehicle" and that "he was just there to inspect the bottom of the trailer." Those statements are inconsistent with Navarro-Gaytan's statement that he was duped into crossing the border and did so to facilitate the purchase and transportation of a crane. Additionally, the affidavit filed in support of the complaint in this matter noted that Navarro-Gaytan had previously been stopped at the border in a truck that was carrying concealed drugs. While no charges were filed related to that event, it leads to the strong inference that Navarro-Gaytan's claims of initial ignorance related to his role in this offense are something less than completely truthful.

Based upon the above, even assuming that it was proper for this Court to consider Navarro-Gaytan's late-made statement, the Court would find that he has not truthfully provided all information and evidence related to his role in the offense. As such, he would remain ineligible for safety valve relief.

## V. Conclusion

The above decisions will guide the Court's final calculation of the defendants' advisory guideline ranges. The Court will formally calculate these ranges during the upcoming continued sentencing hearings to allow counsel to make their objections for the record. The Court will then

consider arguments related to the § 3553 factors and allow the defendants to speak and present argument through counsel on their overall sentences.

IT IS SO ORDERED.

| | |
|---|---|
| June 14, 2017 | /s/John R. Adams |
| Date | JOHN R. ADAMS |
| | UNITED STATES DISTRICT JUDGE |